UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TERRANCE CROCKER, | : | |
| | : | |
| *Plaintiff,* | : | |
| | : | |
| v. | : | No. 3:24-cv-119 (VDO) |
| | : | |
| ELITE ENERGY CONSULTING, LLC | : | |
| and JOSHUA HUTCHINS JONES, | : | |
| | : | |
| *Defendants.* | : | |

## RULING ON MOTION FOR PREJUDGMENT REMEDY

Plaintiff Terrance Crocker was hired in January 2019 by defendant Elite Energy Consulting, LLC to sell solar panels to residential customers.  ECF 40 at 7:5-6.  In December 2020, Crocker was promoted to chief operations officer and became responsible for launching and managing Elite's new installation operations.  *Id.* at 9:18-11:18.  Crocker brought this action against Elite and defendant Joshua Hutchins Jones, one of Elite's owners, alleging nonpayment of "override" commissions for certain installations from December 2021 to October 2023, and moved for a prejudgment remedy. [1]  ECF 1, 2.  Based on the record developed at an evidentiary hearing, the undersigned finds probable cause that Crocker will partly prevail on his claims and GRANTS IN PART his Motion for Prejudgment Remedy.

### A.  LEGAL STANDARD

Rule 64 provides that a plaintiff in federal court may use available state remedies to seize property to secure satisfaction of a potential judgment.  Fed. R. Civ. P. 64(a).  That includes the Connecticut prejudgment remedy statute.  *See* D. Conn. L. Civ. R. 4(c).  Under that statute, a court may grant an application for a prejudgment remedy upon a showing by the movant that

---

[1] Judge Oliver referred the PJR motion to the undersigned for a ruling.  ECF 13.

"there is probable cause to sustain the validity of the plaintiff's claim," taking into account any defenses, counterclaims or setoffs.  Conn. Gen. Stat. § 52-278d(a).  "The legal idea of probable cause is a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it."  *TES Franchising, LLC v. Feldman*, 286 Conn. 132, 137 (2008) (quoting *Wall v. Toomey*, 52 Conn. 35, 36 (1884)).  The probable cause standard is "less demanding than standards which require findings to be made based on a preponderance of the evidence or even a likelihood of success."  *Frontier Home Health & Hospice, LLC v. EH Health Home Health of the Nw.*, No. 3:23-cv-1215 (JCH), 2024 WL 2076850, at *5 (D. Conn. May 8, 2024) (citing *Orsini v. Tarro*, 80 Conn. App. 268, 272 (2003)).  This "weighing process" applies to legal and factual issues alike, *TES Franchising* at 142, as well as to the issue of damages, regarding which plaintiff must provide a "fair and reasonable estimate" but need not be determined with mathematical precision.  *Kendall v. Amster*, 108 Conn. App. 319, 331 (2008).

The PJR statute requires the court not only to review the plaintiff's claims but also to take into account any defenses, counterclaims, or setoffs.  Conn. Gen. Stat. § 52-278d(a)(1).  This consideration is "significant because a valid defense has the ability to defeat a finding of probable cause."  *TES Franchising*, 286 Conn. at 141 (citing *Augeri v. C.F. Wooding Co.*, 173 Conn. 426, 429 (1977) (good defense such as infancy or statute of limitations can be enough to show lack of probable cause)).  Just as with the plaintiff's affirmative claims, the trial court does not apply a preponderance standard to its consideration of the defenses and counterclaims on a PJR motion.  Rather, "[i]n reaching its determination of probable success on the merits [the trial court] is essentially weighing probabilities, and in this it must have a broad discretion."  *Augeri v. C.F. Wooding Co.*, 173 Conn. 426, 429 (1977); *see also McCarter & Eng. LLP v. Jarrow*

2

*Formulas, Inc.*, No. 3:19-cv-1124 (MPS), 2020 WL 2528508, at \*9 (D. Conn. Mar. 3, 2020) (Merriam, M.J.) (disagreeing with handful of Connecticut Superior Court decisions applying preponderance standard to defendant in PJR proceedings and reasoning that defendant's evidentiary burden should not exceed plaintiff's probable cause burden).

### B. CLAIMS AND DEFENSES

Crocker claims nonpayment of commissions in violation of the Connecticut Minimum Wage Act, Conn. Gen. Stat. § 31-72, and breach of a contract setting forth the terms of his compensation.  He seeks unpaid commissions, double damages under the Wage Act, attorney's fees, and interest.  ECF 1.

Defendants raise affirmative defenses of fraud in the inducement relating to the compensation agreement, equitable estoppel, and good faith nonpayment of wages.  ECF 29. They also allege that commissions already paid to Crocker should be set off against any damages award, *id.* at 11, and they assert counterclaims against Crocker alleging breach of fiduciary duty, defamation, copyright infringement, violation of CUTPA, and civil conspiracy. [2] *Id.* at 12-28.

### C. DISCUSSION

#### 1. Breach of contract claim

As described below, the Court finds probable cause to believe that Crocker will prevail on his breach of contract claim against defendant Elite Energy Consulting, LLC, taking into account the alleged counterclaims, defenses, and setoffs.

---

[2] The counterclaims also allege liability against a third-party defendant, Joshua Kekac, *see* ECF 29, but he has not been made a party to this action.

### a. Compensation agreement

Crocker's central piece of evidence is the written agreement regarding his compensation structure that he and Elite signed in December 2020, when he commenced building out the company's installation operations.  ECF 1-1; Pl. Ex. 1.  The contract provided that Crocker would receive base pay of $62,400 per year plus "override pay" of $100 per kilowatt once a permission to operate ("PTO") was issued on a completed installation.  *Id.*  Throughout the four-sentence document, the words "override" and "commission" are used interchangeably.  *Id.*  Crocker has also submitted a list, generated from Elite's database, of jobs between December 2021 and October 2023 on which he claims commissions are owed.  Pl. Ex. 2.

Whereas Crocker contends that overrides were due on all completed installation jobs, Elite contends that overrides were only due on jobs that were "profitable," i.e., where the revenue exceeded the installation costs.  Elite argues that the term "override pay" is inherently ambiguous and, citing the rule of contra proferentem, contends that the agreement should be construed in favor of its interpretation and against Crocker, who drafted it.  Def. Br., ECF 60 at 21-22.

There is some merit to Elite's contention that the word override is ambiguous.  On the one hand, two dictionaries define override as a commission on sales made by a subordinate with no reference to profitability.  *See Override*, Black's Law Dictionary (12th ed. 2024) ("A commission paid to a manager on a sale made by a subordinate."); *Override*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/override (last visited July 11, 2024) ("a commission paid to managerial personnel on sales made by subordinates").  On the other hand, both dictionaries note that override can be synonymous with a royalty, *see id.*, which can mean a share of profit, albeit usually in the context of a mineral lease.  *See Royalty*, Black's ("a share of the product or profit from real property, reserved by the

grantor of a mineral lease"); *Royalty*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/royalty (last visited July 11, 2024)  ("a share of the product or profit reserved by the grantor especially of an oil or mining lease").

But the fact that an override, in the abstract, may or may not be contingent on profitability does not mean that the contract in this case was ambiguous.  As the Connecticut Supreme Court has explained, "a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself."  *Cruz v. Visual Perceptions, LLC*, 311 Conn. 93, 103 (2014) (quotation marks omitted).  The Court finds no genuine ambiguity here.  Per the dictionary definitions cited above, overrides on sales – such as here – are not ordinarily contingent on profitability.  Jones' subjective perception of the word does not displace its ordinary meaning, and the Court "will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity."  *Tallmadge Bros. v. Iroquois Gas Transmission Sys., L.P.*, 252 Conn. 479, 498 (2000) ("[A]ny ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms.").  Nor can the Court read a profitability contingency into the contract where none was indicated either expressly by the parties or by necessary implication.  *See Cruz* at 103 ("contract must be viewed in its entirety, with each provision read in light of the other provisions "); *Heyman v. CBS, Inc.*, 178 Conn. 215, 225 (1979) ("A term not expressly included will not be read into a contract unless it arises by necessary implication from the provisions of the instrument").

Moreover, even assuming the term was ambiguous, extrinsic evidence does not support Elite's interpretation.  Jones testified that, when negotiating the December 2020 contract on Elite's behalf, he understood "override" to mean a share of the profit and would never have agreed to pay a percentage to Crocker for unprofitable jobs.  ECF 40 at 132:20-133:7.  While this

may have been Jones' subjective belief, his assertion that he explicitly told Crocker from the start

not to take an override if a job did not make money, ECF 40 at 134:6-24, is contradicted by other

evidence. [3]  Crocker testified he was paid commissions pursuant to the contractual terms between

December 2020 and December 2021.  ECF 40 at 18:16-25.  Elite's former IT director, Luke

Osmundsun, testified that he met with Jones and Crocker in June 2021 to create a tracking

system for commissions but Jones did not instruct him to filter jobs based on profitability.  ECF

57 at 124:8-128:9.  And although Jones testified that he had growing concerns about Elite's

Connecticut operations that came to a head in a September 2022 meeting with sales

representatives who informed him that the operations were a "disaster," ECF 40 at 133:8-15,

175:10-25, 224:8-227:17, at which time he "reiterated" that Crocker should not take override pay

on unprofitable jobs, 140:13-23, 145:16-25, there is no evidence that he sought to claw back

overrides previously paid on unprofitable jobs, or that he sought to offset overrides already paid

on unprofitable jobs against future overrides, or that he intervened to stop such payments in their

entirety until Elite's newly-hired CEO, Steve Lawrence, froze overrides for Crocker and other

operations management staff on August 1, 2023 at Jones' direction, ECF 40 at 90:12-91:8,

207:21-208:11; ECF 57 at 93:20-94:11.  On this background, his September 2022 instruction

---

[3] Defendants also contend that Crocker's testimony regarding override calculations supports their interpretation.  In the relevant section, *see* ECF 40 at 37:24-39:22, Crocker did not admit that his overrides were contingent on profitability – rather, he seemed to be saying that the commissions of sales representatives were based on a job's net revenue but the sales manager's override was "built in" to the cost.  *See id.* at 39:2-10.  Regardless, given the general incoherence of this testimony, the Court does not find it illuminating one way or the other.

appears to have been a modification of the compensation agreement rather than reiteration of an original term. [4]

Given that the parties' intended meaning is clear from the contract itself – and from extrinsic evidence as well – there is no basis for the Court to construe the agreement against the drafter.  The Connecticut Supreme Court has instructed that the principle of contra proferentem is

> applicable only as a last resort, when other techniques of interpretation and construction have not resolved the question of which of two or more possible meanings the court should choose.  One court wrote that the rule is a tie breaker *when there is no other sound basis for choosing one contract interpretation over another*.  The rule is not applicable at all if only one reasonable meaning is possible.

*Cruz*, 311 Conn. at 107 (emphasis retained) (instructing trial court on remand to invoke contra proferentem only as last resort if unable to resolve ambiguity via extrinsic evidence).  There is no need to resort to contra proferentem here because the only reasonable interpretation is that the overrides were not contingent on profitability.

Elite also contends that overrides were not owed on dealer installations and out-of-state installations.  However, Crocker credibly testified that he oversaw operations for these jobs, with the exception of those in Texas where Elite did not perform installations, ECF 40 at 55:3-57:18, and Osmundsun testified that he was not asked to filter out dealer and out-of-state installations from the tracking system for Crocker's overrides, ECF 57 at 124:8-128:9.  Consequently, the Court finds probable cause that overrides were owed on these jobs as well, except for the one Texas job on page 5 of Pl. Exhibit 2, which Crocker acknowledged would be an error.  ECF 40 at 56:20.

---

[4] The compensation agreement did not require that any modifications be made in writing, and Crocker made no such claim in his testimony.  Rather, Crocker admitted that if Jones believed the overrides needed to be changed, "he had all the power to do so."  ECF 40 at 90:10-11.

Nonetheless, the evidence does support three general reductions in the list of overrides claimed by Crocker in Pl. Exhibit 2. *First*, Def. Exhibit BB, which is similar to Pl. Exhibit 2 but contains some additional columns, denotes some of the jobs claimed by Crocker as "NO PTO" and indicates that another was issued a PTO after Crocker's termination, and Crocker did not submit admissible contrary evidence. [5]  Because the agreement only provided for overrides "at the PTO stage," ECF 1-1, Crocker has not established entitlement to overrides on those jobs. *Second*, given that Elite's new CEO formally halted overrides on August 1, 2023, Crocker was not entitled to payment for any jobs from that date forward.  *Third*, crediting Jones' testimony that he instructed Crocker in September 2022 not to take overrides on unprofitable jobs, Crocker has not established entitlement to overrides on jobs listed on Def. Exhibit Z (listing unprofitable jobs) that postdate September 2022. [6]

In sum, the Court finds that the $552,906 in overrides claimed in Pl. Exhibit 2 must be reduced by $141,269 for jobs dated as of the August 1, 2023 freeze or later; by $440 for the Texas job (D. Lopez); by $12,407.50 for the pre-August 2023 jobs cross-referenced on Def. Exhibit BB as having no PTO during Crocker's tenure; by $474 for the job on Def. Exhibit BB

---

[5] Plaintiff sought to introduce letters showing that there was permission to operate on those jobs but the Court found his proffer insufficient and sustained defendants' objections based on hearsay and foundation.  ECF 57 at 105:20-112:4.

[6] Def. Exhibit Z is a summary of jobs on which defendants contend resulted in losses based on an audit conducted by new CEO Steve Lawrence.  Plaintiff's witness Erinn Triplett, who was a prior general manager at Elite under Crocker and now works with Crocker's new company in competition with Elite, testified that some of the jobs listed on Def. Exhibit Z were not unprofitable, including but not limited to ten examples that she described in her testimony (Castillo Flores, Balthazar, Pelchat, Kaziba, Kelly, Nanni, Ostuno, Kinniburgh, Miller, and S. Thompson).  ECF 57 at 157:10-162:20.  However, given the cursory nature of this rebuttal and conflicting evidence from Elite's CEO Steve Lawrence, *id.* at 167:22-171:22, there is insufficient evidence at this juncture to conclude either that Pl. Exhibit Z is entirely unreliable or that the ten jobs discussed by Triplett were actually profitable.

with a PTO after Crocker's termination (E. Hoy); and by $71,862 for unprofitable jobs cross-referenced on Pl. Exhibit 2 and Def. Exhibit Z dated between the September 2022 modification and the August 1, 2023 freeze. [7]  With those reductions, the Court finds probable cause that Crocker will obtain a judgment of **$351,268.50** in unpaid overrides on his breach of contract claim.

### b. Fraudulent inducement defense

Elite's affirmative defense of fraudulent inducement was not persuasively supported by hearing evidence.  The essential elements of fraudulent inducement are: "(1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury." *Harold Cohn & Co. v. Harco Int'l, LLC*, 72 Conn. App. 43, 51 (2002).  "Fraud in the inducement of a contract ordinarily renders the contract . . . voidable at the option of the defrauded party[.]" *A. Sangivanni & Sons v. F. M. Floryan & Co.*, 158 Conn. 467, 472 (1969).

Here, Elite contends that it entered the contract in reliance on Crocker's statements that (a) he had experience managing successful solar installation operations, (b) that he was capable of establishing such operations for Elite, and (c) that the operations would be profitable.  Def. Br., ECF 60 at 16-17.  Elite has not established that the first two representations were untrue and known to be untrue.  There is no evidence to rebut Crocker's statements regarding his prior experience and, as for his capability, the evidence shows that he did develop operations by which Elite installed solar panels on customers' houses and obtained permissions to operate.  As for the

---

[7] Any job in more than one category has been applied toward reduction only once.  Also, any job described as unprofitable on Def. Exhibit Z but not claimed on Pl. Exhibit 2 has not been counted in the reductions.

third alleged misrepresentation, Elite argues that Crocker proved incapable of turning a profit. However, neither Crocker's belief that he could build a profitable operation nor his profit estimates qualify as statements of existing or past facts, as opposed to opinions.  *See Paiva v. Vanech Heights Const. Co.*, 159 Conn. 512, 515 (1970) ("the general rule is that a misrepresentation must relate to an existing or past fact"); *Crowther v. Guidone*, 183 Conn. 464, 467-68 (1981) ("[This] requirement focuses on whether, under the circumstances surrounding the statement, the representation was intended and understood as one of fact as distinguished from one of opinion."); *see also*, *e.g.*, *Fenix Grp. LLC v. GPM Invs., LLC*, No. CV-18-6043242-S, 2023 WL 369986, at *6 (Conn. Super. Ct. Jan. 17, 2023) (predictions that business could become valuable investment in future were not statements of fact as required to establish fraud).  And even assuming that beliefs or estimates could qualify as misrepresentations of fact, the hearing evidence did not establish that Crocker knew them to be untrue when he was developing the operations model in consultation with Jones between the Fall of 2019 and December 2020.  ECF 40 at 10:24-11:11, 15:4-39:23-43:2, 48:21-52:24, 89:10-21, 98:14-101:11, 122:19-123:1, 183:12-190:15, 192:4-193:9.  Consequently, while discovery could potentially lead to further support for this affirmative defense, Elite has failed to offer sufficient evidence in support of its fraudulent inducement defense for purposes of the PJR Motion.

### c.  Equitable estoppel defense

Elite's equitable estoppel defense is likewise unavailing.  "Equitable estoppel is a doctrine that operates in many contexts to bar a party from asserting a right that it otherwise would have but for its own conduct."  *Glazer v. Dress Barn, Inc.*, 274 Conn. 33, 60 (2005).  In plainer terms, equitable estoppel "preclude[s] a person from asserting a right when they have led another to form the reasonable belief that the right would not be asserted, and loss or prejudice to the other

would result if the right were asserted." 28 Am. Jur. 2d Estoppel and Waiver § 28.  Under Connecticut law, the defense of equitable estoppel has two essential elements: (1) "the party must do or say something that is intended or calculated to induce another to believe in the existence of certain facts and to act upon that belief," and (2) "the other party, influenced thereby, must actually change his position or do some act to his injury which he otherwise would not have done." [8]  *Id.* (citation and quotation marks omitted).  Additionally, the party claiming estoppel bears the burden of showing "that he exercised due diligence to ascertain the truth and that he not only lacked knowledge of the true state of things but had no convenient means of acquiring that knowledge." *Boyce v. Allstate Ins. Co.*, 236 Conn. 375, 385-86 (1996) (citation and quotation marks omitted).

Here, Elite appears to contend that Crocker should be estopped from pursuing his contractual right to overrides because he misled Elite during the contract formation as to his abilities and the profit estimates.  Def. Br. at 23-24.  Even assuming without deciding that equitable estoppel could be a legally viable defense to the formation of the agreement,[9] it fares

---

[8] As one example in the contract context, a defendant may be estopped from asserting the statute of frauds as a defense to enforcement where he induced plaintiff's part performance of an oral contract. *See Glazer v. Dress Barn, Inc.*, 274 Conn. 33, 61 (2005).  In other examples, equitable estoppel may be used to compel arbitration by or against a non-signatory who has asserted rights under a contract that also contains an arbitration clause, *see Armetta v. Corvo*, No. CV-136046616-S, 2015 WL 5315247, at *3 (Conn. Super. Ct. Aug. 11, 2015), or may be a defense to foreclosure where the lender's acceptance of post-default payments induced the borrower to believe he was no longer in default.  *CGCMT 2006-C5 Talcottville Rd., LLC v. Tri-City Improvements, LLC*, No. CV-17-6012213-S, 2018 WL 1278322, at *3 (Conn. Super. Ct. Feb. 9, 2018).

[9] Elite has cited no authority for invoking equitable estoppel as a defense to contract formation. The Court's own non-exhaustive search only uncovered one related example in Connecticut, in which a foreclosure defendant was permitted to pursue equitable estoppel based on an allegation that the lender knew from the start that it would fail due to the borrower's financial situation.  *See Bank of Am., N.A. v. Aubut*, 167 Conn. App. 347, 381 (2016).

no better than the fraudulent inducement defense because Elite has failed to demonstrate "some intended deception in the conduct or declarations of the party to be estopped, or such gross negligence on his part as amounts to constructive fraud," as is generally required for the doctrine to apply. *See Novella v. Hartford Acc. & Indem. Co.*, 163 Conn. 552, 564 (1972). Alternatively, assuming that Elite is not disputing the existence of the wage obligation but, rather, contending that it should be excused from paying, the current record still does not support the defense. Specifically, Elite has not evidenced any words or actions by Crocker post-formation that caused Elite to change its position in such a way that enforcement of payment obligation would be inequitable. At most, there is evidence that Crocker agreed to defer override payments, ECF 40 at 19:25-22:4, but there is no evidence that Elite changed its position as a result. Alternatively, if Elite's theory is that Crocker hid the company's financial difficulties to lull Elite into inaction while running up commissions, Elite has not shown that it exercised due diligence to ascertain the truth or had no means of acquiring that knowledge. *See Boyce*, *supra*. Rather, the evidence indicates that Jones was able to directly access to all computer systems and company information that he chose to review. *See*, *e.g.*, ECF 57 at 131:8-132:3. For all these reasons, Elite has failed to support its equitable estoppel defense for purposes of the PJR Motion.

### 2. Wage Act claim

The Court also finds probable cause to believe that Crocker will prevail on his claims against defendants Elite and Jones under § 31-72 of the Connecticut General Statutes, which provides a private right of action for unpaid wages by an employee against his employer. As discussed above, the evidence indicates that Crocker was owed overrides of $100 per kilowatt for installations that obtained a PTO. These qualify as wages within the meaning of the Wage Act, which expressly defines wages to include commissions. *See* Conn. Gen. Stat. § 31-71a(3);

*see also Mytych v. May Dep't Stores Co.*, 260 Conn. 152, 160 (2002) ("the formula by which an employee's wage is calculated is determined by the agreement between the employer and the employee"); *Ass'n Res., Inc. v. Wall*, 298 Conn. 145, 173 (2010) (even a bonus may qualify as a wage if "nondiscretionary and calculated in accordance with a precise formula").

Additionally, both Jones and Elite qualify as an employer as defined in § 31-71a(1) because Elite was the party who entered the written contract for base pay and commissions and Jones was "an individual who possesse[d] the ultimate authority and control within a corporate employer to set the hours of employment and pay wages and therefore [was] the specific or exclusive cause of improperly failing to do so." *Butler v. Hartford Technical Institute, Inc.*, 243 Conn. 454, 462 (1997).  Although defendants note that Crocker had authority as the chief operating officer to compute and issue his own override payments, Jones still retained "ultimate authority" to determine and pay wages as owner and CEO.  *Cf. Petronella ex rel. Maiorano v. Venture Partners, Ltd.*, 60 Conn. App. 205, 210-11 (2000) (affirming trial court's finding that non-owner officers had "ultimate authority" where they, *inter alia*, "controlled and dominated" the company, had "specific, unencumbered dominion and control over how the moneys . . . were to be spent" and "[a]ll decisions concerning the running of the company were made by them").  The evidence indicates that although Crocker had significant independence in building and managing operations, he still reported to and regularly consulted with Jones.  ECF 40 at 80:6-81:21, 95:19-96:14, 103:7-15.  Jones also testified that he hired new employees in late 2022 to investigate how Crocker was running operations, ECF 40 at 146:16-147:4, 151:2-22, that he instructed Crocker in September 2022 not to take overrides on unprofitable jobs, *id.* at 140:17-23, 145:16-25, and that he made the decision to halt all overrides beginning in August 2023, *id.* at 207:21-208:11, which demonstrates that he had ultimate authority.  Nor did Crocker's assent to

defer payment of overrides justify permanent nonpayment or mean that Jones was not the specific or exclusive cause of nonpayment.  Any deferred overrides would presumably have become due as of Crocker's November 2023 termination, at the latest,[10] and the decision not to pay any wages earned as of the date of discharge rested exclusively with Jones.

Based on the above determinations concerning Crocker's compensation structure, the Court finds probable cause that Crocker will obtain a favorable judgment on his Wage Act claim against both Elite and Jones such that they are jointly and severally liable for the same **$351,268.50** in unpaid overrides as calculated in connection with the breach of contract claim above.

### a.  Equitable estoppel defense

To the extent that defendants are asserting equitable estoppel as a defense to the Wage Act claims, the Court has concerns about whether an employee could be equitably estopped from enforcing an entitlement to unpaid wages in light of the strong public policy in favor of timely payment of wages evinced in the Wage Act.  *See* Conn. Gen. Stat. § 31-71a, *et seq.*; *see also Shortt v. New Milford Police Dep't*, 212 Conn. 294, 309 n.13 (1989) (citing legislative history describing payment of earned wages as "a basic gut-level right that should be assured by clear, strong state statutes") (citation omitted).  Although the Court directed the parties to brief "whether equitable estoppel is a defense to Crocker's claims at law (and which claims)," *see* ECF 54, defendants' brief does not address the question and plaintiff's brief discusses nonpayment of overtime or minimum wages rather than unpaid commissions such as those at issue here.  Regardless, the Court need not presently decide the issue of whether equitable estoppel is a

---

[10] *See* Conn. Gen. Stat. § 31-71c(b): "Whenever an employer discharges an employee, the employer shall pay the employee's wages in full not later than the business day next succeeding the date of such discharge."

legally valid defense to an unpaid wage claim given its finding above that the current factual

record is insufficient to support the equitable estoppel defense.

### b.  Good faith defense to double damages

The next issue is whether defendants "had a good faith belief that the underpayment of

wages was in compliance with law" such that they may be excused from paying "twice the full

amount of such wages" as provided in § 31-72.  This language was part of a 2015 amendment to

the state statute that aligns it with the federal Fair Labor Standards Act by placing the burden on

the employer to prove good faith to avoid penalty damages, rather than on the employee to prove

bad faith.  *Borderud v. Riverside Motorcars, LLC*, No. 3:18-cv-1291 (SALM), 2022 WL 855485,

at *2 (D. Conn. Mar. 23, 2022).  The Connecticut Appellate Court has applied the traditional

definition of good faith to the § 31-72 analysis:

> The term "good faith" is "well defined as meaning [a]n honest intention to abstain
> from taking an unconscientious advantage of another, even through the forms or
> technicalities of law, together with an absence of all information or belief of facts
> which would render the transaction unconscientious. . . .  It is a subjective
> standard of honesty of fact in the conduct or transaction concerned, taking into
> account the person's state of mind, actual knowledge and motives."

*Nettleton v. C & L Diners, LLC*, 219 Conn. App. 648, 709 (2023) (citation omitted) (noting that

the FLSA "similarly" puts "difficult" burden on employer to establish good faith and objective

reasonableness).

The Court finds that defendants have established a degree of subjective good faith

sufficient for purposes of this preliminary PJR analysis.  The Court credits Jones' subjective

belief that Crocker was not entitled to overrides on the jobs that had net losses, *see* ECF 40 at

131-136 and Def. Ex. Z, despite the Court's finding that such a condition is not actually provided

in the compensation agreement and the Court's declination to read such a term implicitly into the

contract.  While Jones' subjective beliefs were not sufficient to alter the terms of the

compensation agreement as written, those beliefs are relevant to the Court's analysis of good faith. The Court finds that Jones consistently and sincerely believed that Crocker was not entitled to overrides on unprofitable jobs, despite evidence that Crocker was paid such overrides between December 2020 and December 2021, ECF 40 at 18:16-25, and that Jones did not prevent Crocker from taking such overrides until September 2022. Other evidence suggests that Jones' failure to raise the issue prior to September 2022 was due to a combination of Crocker being in charge of his own pay, *see* ECF 40 at 136:14-21, and Jones' lack of oversight.

As for whether defendants acted in good faith when they withheld payment of overrides on jobs that they apparently do not dispute were profitable, the record is unclear as to when they first became aware of Crocker's contention that he had not been paid and what support he provided for his demand. There is evidence that, during his tenure, Crocker usually was responsible for tracking and directing payroll, including his own overrides, ECF 40 at 79:14-82:10, 85:14-20. There is also evidence that data management and financial accounting were haphazard under Crocker's management, *e.g.*, ECF 57 at 11:20-16:9, and even he admitted that information in the Salesforce database might be unreliable, *e.g.*, ECF 40 at 57:19-58:13, 81:19-82:25. It also appears, as discussed below in connection with Elite's counterclaim for fiduciary breach, that defendants had some reasonable basis to question Crocker's assertions of fact in relation to financial decisions, including payroll, and to believe that they had been taken advantage of. While the full development of a factual record through discovery may undermine defendants' claim of subjective good faith, the Court concludes on the current record that defendants had an "honest intention" and good-faith basis in defending against Crocker's demands for payment and in claiming setoff for overrides they believe were incorrectly paid and,

therefore, that there is not probable cause that Crocker will be awarded penalty damages under § 31-72.

### 3.   No viable setoff demonstrated

In their Amended Answer, defendants allege that all override payments that Crocker took during his tenure should be set off against his claim.  ECF 29 at 11.  However, they have not yet adduced any evidence showing that these paid overrides fell into one of the exceptions to the override structure identified above (no PTO, Texas dealer, unprofitable job postdating September 2022, or any job postdating the August 1, 2023 override freeze).  So the present record provides no basis for the Court to set them off against overrides still owed.

### 4.   Counterclaim for fiduciary breach

The evaluation of Elite's counterclaim for breach of fiduciary duty presents a closer question.  The counterclaim has four essential elements: "[1] that a fiduciary relationship existed which gave rise to a duty of loyalty, an obligation to act in the best interests of the plaintiff, and an obligation to act in good faith in any matter relating to the plaintiff; [2] that the defendant advanced his or her own interests to the detriment of the plaintiff; [3] that the plaintiff sustained damages; and [4] that the damages were proximately caused by the fiduciary's breach of his or her fiduciary duty."  *Rendahl v. Peluso*, 173 Conn. App. 66, 100, 162 A.3d 1, 22 (2017) (cleaned up) (quoting T. Merritt, 16 Connecticut Practice Series: Elements of an Action (2016–2017 Ed.) § 8:1). [11]  Here, Crocker admits that he owed a duty to Elite as its COO and employee.  Pl. Br. at 19; *see also ATI Eng'g Servs., LLC v. Millard*, No. X03-cv-18-6118978-S, 2022 WL 1553389, at *12 (Conn. Super. Ct. May 16, 2022) (COO was "unquestionably" in fiduciary relationship with employer who entrusted to conduct day-to-day business of company).  However, it is

---

[11] *Rendahl* was overruled in nonrelevant part by *Barash v. Lembo*, 348 Conn. 264 (2023).

questionable whether his conduct as evidenced at the hearing amounts to disloyalty, not acting in Elite's best interests, or bad faith.

In Connecticut, "[t]he most common bases of complaint are that a party subject to a fiduciary duty has diverted a business opportunity, competed with the business, or dealt improperly with the business for personal gain."  R. Langer et al., 12 Connecticut Practice Series: Connecticut Unfair Trade Practices, CUTPA and Related Business Torts (2021-2022 Ed.) § 4.13.  Such activity is not evident here.  Rather than disloyalty, Elite mostly accuses Crocker of incompetence, such as failure to track expenses and receivables; failure to prevent overbilling by contractors; assigning work to outside contractors while in-house teams sat idle; failure to ensure that sales reps were properly licensed; failure to maintain accurate records, including intentionally not recording receipt of job funding in order to delay commission payments to sales reps; and failure to ensue all sales reps signed a noncompete.  Def. Br. at 27-31.  What is missing is any evidence as to the second element, i.e., that Crocker advanced his own interests to the detriment of Elite.  *See Rendahl* at 100.  Defendants argue that Crocker "did very well for himself" financially while Elite suffered substantial losses.  Def. Br. at 31.   Although Crocker apparently lacked incentive to ensure that jobs were profitable, at least until September 2022, there is insufficient evidence to support an inference that he prioritized volume over profitability to inflate his own compensation.

Elite's best evidence relating to fiduciary duties is that Crocker used his position to staff Elite with friends, ECF 40 at 149:12-23, and to benefit favored friends such as by prioritizing payments to Joshua Kekac over other sales reps, which disrupted Elite's relationship with its sales reps, ECF 57 at 77:20-78:21, and by contracting on Elite's behalf to increase Erinn Triplett's compensation (although there is conflicting testimony about whether Jones agreed to this

decision).  ECF 40 at 113:25-116:6, 176:1-15.  Jones further testified that when he hired additional employees to investigate the problems in operations under Crocker's management and implement new controls, Crocker was uncooperative, resisted their access to information, and told Jones that he could "shut off every single system that we had installed with the click of a button."  ECF 40 at 149:12-152:20.  There is also evidence that Crocker shared confidential financial information with Kekac and outside the company.  ECF 57 at 78:22-79:2, 80:4-81:17; Def. Ex. W.  This evidence is more troubling when coupled with the fact that Crocker failed to ensure that Kekac signed a noncompete with Elite, ECF 40 at 172:24-173:22, and Kekac and Triplett now work for Crocker's new company that competes with Elite.  ECF 40 at 173:24-174:6; ECF 57 at 115:1-4.  Nonetheless, the present record still does not support a conclusion that Crocker competed with Elite – or arranged to compete in the future – during his tenure. Some such conduct is alleged in the counterclaim, *e.g.*, ECF 29 ¶ 46(q), but is not presently in evidence.

In short, although the evidence developed thus far suggests that Elite has a colorable claim for fiduciary breach that requires the development of a more robust record through discovery, there is insufficient evidence in the present record for the Court to conclude that Crocker is likely to be liable for fiduciary breach, and in what amount, such as may offset any judgment for unpaid wages.

### 5.  Counterclaims not evidenced at PJR hearing

Defendants' Amended Answer asserts four additional counterclaims for which they did not put on evidence at the PJR hearing: defamation, copyright infringement, violation of CUTPA, and civil conspiracy.  ECF 29 at 22-28.  Some of the allegations here are troubling, particularly the optics of Crocker having used his position at Elite to prioritize payment to his

friends while failing to have one of them sign the standard noncompete, and then starting a company with them that competed against Elite after he was terminated.  Nonetheless, while they may be viable on a more developed record, they are insufficiently developed at present to weigh against the Court's probable cause finding as to plaintiff's claims.

### 6.  Attorney's fees and interest

Section 31-72 also provides for attorney's fees and costs; however, these categories are not yet in evidence, and so are not included in the present calculation.

The Court also finds that there is not probable cause to conclude that Crocker will be awarded prejudgment interest.  Crocker contends that the 12% rate provided in § 31-265 automatically must apply, despite the fact that § 31-72 mentions § 31-265 only in connection with collections by the Labor Commissioner. [12]  There are at least three decisions that have interpreted § 31-72 that way.  *See Tahirou v. New Horizon Enterprises, LLC*, No. 3:20-cv-281 (SVN), 2022 WL 510044, at *14 (D. Conn. Feb. 21, 2022) (Farrish, M.J.); *Lockhart v. NAI Elite, LLC*, No. HHD-CV-18-6098616, 2020 WL 5261242, at *12 (Conn. Super. Ct. Aug. 5, 2020); *Stevens v. Vito's by the Water, LLC*, No. HHD-CV-15-6062506-S, 2017 WL 6045302, at *6 (Conn. Super. Ct. Nov. 9, 2017).  However, although no Connecticut appellate decision addresses whether § 31-265 applies to all actions under § 31-72 or only collection efforts by the Commissioner, the Appellate Court recently affirmed a trial court's award of prejudgment interest on unpaid wages that was calculated pursuant to the ordinary prejudgment interest statute (§ 37-3a) rather than § 31-265.  *See Paniccia v. Success Vill. Apartments, Inc.*, 215 Conn. App. 705,

---

[12] The relevant sentence provides: "The Labor Commissioner may collect the full amount of any such unpaid wages, payments due to an employee welfare fund or such arbitration award, as well as interest calculated in accordance with the provisions of section 31-265 from the date the wages or payment should have been received, had payment been made in a timely manner." Conn. Gen. Stat. § 31-72.

736 (2022) (affirming award of prejudgment interest on judgment for breach of contract and unpaid wages, which constituted "detention of money after it became payable" within the meaning of § 37-3a). Other trial court decisions have also applied the standard prejudgment interest provisions of § 37-3a to unpaid wage claims. *See*, *e.g.*, *Wei v. Sichuan Pepper, Inc.*, No. 3:19-cv-525 (JBA), 2022 WL 385226, at *14 (D. Conn. Jan. 17, 2022) (Farrish, M.J.), *report and recommendation adopted*, 2022 WL 382019 (D. Conn. Feb. 7, 2022); *Bissonnette v. Highland Park Mkt., Inc.*, No. HHD-CV-106014088-S, 2014 WL 2580668, at *2 (Conn. Super. Ct. May 1, 2014). The Court will therefore do the same.

Section 37-3a provides that prejudgment interest "may be recovered and allowed . . . as damages for the detention of money after it becomes payable." Trial courts have discretion to determine the appropriate amount of interest to award up to the 10% maximum rate provided in the statute. *McCarter & Eng., LLP v. Jarrow Formulas, Inc.*, No. 3:19-cv-1124 (MPS), 2024 WL 489328, at *23 (D. Conn. Feb. 8, 2024) (citing *Sears Roebuck & Co. v. Bd. of Tax Rev.*, 241 Conn. 749, 765 (1997)). "The trial court's discretion in awarding interest is quite broad, and the court may consider whatever factors may be relevant to its determination . . . The assertion of a good faith defense is one factor that the court may consider, but it does not bar an award of interest." *Salce v. Wolczek*, 314 Conn. 675, 696-97 (2014) (cleaned up).

Here, for the reasons articulated in the discussion of good faith above, the Court finds no probable cause that Crocker will be awarded prejudgment interest. Crocker himself was responsible for financial accounting and payroll, and there is evidence of mismanagement such that the Court deems defendants' defenses to be well taken at this juncture, even if they are not ultimately successful. The Supreme Court's reasoning in another breach of contract action is instructive. In that case,

> [t]he trial court declined to award prejudgment interest after concluding that the
> defendant pursued his defense of the plaintiff's claims in good faith. The court
> expressly determined, however, that the balance of equities changed once the trial
> court resolved the parties' dispute in the plaintiff's favor. Accordingly, the reason
> for the different decisions regarding prejudgment and postjudgment interest was
> the intervening conclusion by the trial court that the plaintiff was entitled to
> payment. . . . Whether to award prejudgment and postjudgment interest for the
> detention of money under General Statutes § 37-3a is a decision left to the
> discretion of the trial court, and requires the trial court to consider whether an
> award of interest is fair and equitable under the circumstances.

*Salce* at 696. Similarly, here, defendants have presented a good-faith basis to question Crocker's claims given his unusual degree of control and the evidence of poor management, and the Court is not persuaded at this juncture that the equities will favor an award of prejudgment interest despite its finding of probable cause that Crocker will prevail on his claim for unpaid overrides.

### D.  CONCLUSION

For all these reasons, the Court finds probable cause that Crocker will obtain a judgment against Elite and Jones, jointly and severally, in the amount of $351,268.50. The Court does not find probable cause at this time that Crocker will be awarded penalty damages under § 31-72 or prejudgment interest. The Court finds probable cause that Crocker will be awarded attorney's fees under § 31-72 but has no basis for determining that amount. The Court therefore grants Crocker's Motion for Prejudgment Remedy in the total amount of **$351,268.50**.

This is not a recommended ruling. An application for prejudgment remedy is not dispositive and may be decided by a magistrate judge. *See N. Jonas & Co. v. Bros. Pool Enterprises, Inc.*, 638 F. Supp. 3d 193, 204 n.4 (D. Conn. 2022) (citing examples). As such, it is

an order of the Court unless reversed or modified by the District Judge upon motion timely made.  28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); and D. Conn. L. Civ. R. 72.2.

SO ORDERED, this 31st day of July, 2024, at Bridgeport, Connecticut.

*/s/ S. Dave Vatti*
S. DAVE VATTI
United States Magistrate Judge